# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **WAH SING (US) TRADING** | ) | |
| **LIMITED, LLC D/B/A EASYBIT,** | ) | **Civil Action No.** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **DEDRIC DUNCAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

### INTRODUCTION

Defendant Dedric Duncan's illicit actions against Plaintiff Wah Sing (US) Trading Limited, LLC d/b/a EasyBit ("EasyBit" or "Plaintiff") have resulted in this lawsuit, in which EasyBit has brought several claims against Duncan. But EasyBit's instant Motion for Temporary Restraining Order is based only upon Duncan's violation of his non-compete covenant and tortious interference with EasyBit's contractual and business relations. The facts in EasyBit's Verified Complaint for Injunctive Relief and Damages (the "Complaint" or "Compl."), which has been filed contemporaneously, show that Duncan is currently competing with EasyBit in direct contravention of his non-compete covenant, and that he has told the owners and/or

managers of the locations that host EasyBit's Bitcoin ATM's (defined below) that EasyBit is no longer operating in Georgia and Alabama and that they should deal only with Duncan. If ever there was a set of facts that cried out for interlocutory injunctive relief, these are those facts.

## STATEMENT OF FACTS

### A. Bitcoin and EasyBit

Bitcoin is a digital form of currency which allows users to transact business without an intermediary (i.e., a bank or credit card company). (Compl., ¶ 5). Bitcoin can be exchanged for products, services, and other currencies. (*Id.*). Merchants have an incentive to accept bitcoin because fees are lower than the 2–3% fees imposed by credit card processors, and typically fees are paid by the purchaser, not the merchant. (*Id.*). Moreover, government agencies in many countries are beginning to recognize bitcoin as a legitimate and valuable form of currency. (*Id.*). For example, in the United States, the Federal Election Commission approved the use of bitcoin donations to political candidates and committees, and former Presidential candidate Rand Paul has accepted donations in bitcoin. (*Id.*). Additionally, IBM recently announced that it plans on becoming the biggest backer of a technology that underpins the bitcoin digital currency. (*Id.*).

One way to acquire or exchange bitcoin is through an automatic teller machine (ATM) designed specifically for bitcoin (a "Bitcoin ATM"). (*Id.* at ¶ 6). For example, if a U.S. based company was asked by a photographer in the Netherlands to pay her the equivalent of $500 in bitcoin in order to use one of her photographs on its website, one way the company could acquire those bitcoin is through a Bitcoin ATM. (*Id.*). The company would: (i) locate a Bitcoin ATM;     (ii) insert $500 cash plus a processing fee; (iii) receive a unique code worth the equivalent of $500 in bitcoin; and (iv) electronically transfer/wire the bitcoin from its bitcoin account (or "wallet") to the photographer's bitcoin wallet. (*Id.*).

EasyBit is one of the world's leading Bitcoin ATM companies. It provides access to buy and/or sell bitcoin in over a dozen countries. (*Id.* at ¶ 7). EasyBit's most profitable Bitcoin ATM's are located in Atlanta and Marietta, Georgia. (*Id.* at ¶ 8). Within this judicial district, EasyBit also owns and operates successful Bitcoin ATM's in Acworth and Lilburn, Georgia. (*Id.*). EasyBit is a wholly owned subsidiary of Wah Sing (HK) Trading Limited, which is owned entirely by Michael Dupree, Jr. ("Dupree"). (*Id.* at ¶ 9).

Dupree, a serial entrepreneur, founded EasyBit in 2014 and serves as its Chairman. (*Id.* at ¶ 10). As EasyBit's business began to grow, Dupree realized that

he needed to hire someone to manage EasyBit's day-to-day operations so that he could focus on EasyBit's global expansion and business strategy. (*Id.*).

**B. <u>EasyBit's Employment of Duncan and His Non-Compete Covenant</u>**

Dupree had met Duncan at a bitcoin conference in 2014, and decided to reach out to him about working for EasyBit. (*Id.* at ¶ 11). On April 3, 2015, Duncan and EasyBit entered into a negotiated employment agreement (the "Employment Agreement") pursuant to which Duncan became EasyBit's Chief Executive Officer ("CEO") with the primary responsibility of "managing the set up, operation, and positive cash flow from bitcoin ATM's, and bitcoin product services, nationally." (*Id.* at ¶ 12, Ex. "A"). Upon information and belief, Duncan signed the Employment Agreement in either Georgia or Alabama. (*Id.*). He was paid a $5,000 signing bonus upon execution, and was eligible to receive a 10% equity interest in EasyBit after completing a year of employment. (*Id.*).

In the Employment Agreement, Duncan agreed to the following provision (the "Non-Compete Covenant"):

> The employee specifically agrees that for a period of 1 year after the Employee is no longer employed by the Company, the Employee will not engage, directly, or indirectly, either as proprietor, stockholder, partner, officer, Owner, employee, or otherwise, in the same or similar activities as were performed for the Company in any business which distributes or sells products or provides services similar to those distributed sold or provided by the Company at any time during the period of your employment with the Company.

(*Id.* at ¶ 13, Ex. A). Soon after executing the Employment Agreement, Duncan began setting up and operating EasyBit's Bitcoin ATM's on EasyBit's behalf. (*Id.* at ¶ 14). For example, on June 29, 2015, EasyBit entered into an "Agreement for the Placement of a Bitcoin ATM" (a "Location Agreement") with Headmasters Barbershop in Atlanta, Georgia. (*Id.* at ¶ 15). Duncan executed the Location Agreement for EasyBit and, once the Bitcoin ATM was delivered to Headmasters Barbershop in July 2015, Duncan set up and serviced this machine, including by withdrawing the cash and bitcoin deposited by customers and refilling the bitcoin allotment. (*Id.*).

In 2015, EasyBit amended its filings with the Nevada Secretary of State to list Duncan as one of EasyBit's officers. (*Id.* at ¶ 16, Ex. "B"). In his position as EasyBit's CEO, Duncan had virtually unlimited access to EasyBit's physical assets (its Bitcoin ATM's, cash, and bitcoin), as well as to EasyBit's customer, vendor, and host location information, all of which EasyBit considers to be confidential and proprietary. Besides Duncan and Dupree, EasyBit had only one other employee. (*Id.* at ¶ 17).

## C. Formation of EasyBit Alabama and Duncan's Scheme Against EasyBit

In July 2015, EasyBit formed a subsidiary called EasyBit Alabama, LLC ("EasyBit Alabama") to handle EasyBit's burgeoning business interests in the

southeastern U.S. (*Id.* at ¶ 18). EasyBit provided 100% of the start-up capital for EasyBit Alabama, and was to be its sole owner. (*Id.*). Duncan and EasyBit agreed to amend the Employment Agreement in part such that Duncan would also serve as the CEO of EasyBit Alabama and, in addition to his compensation directly from EasyBit, he would receive 30% of the net profits generated by EasyBit Alabama while he served as its CEO. (*Id.* at ¶ 19). Duncan's responsibilities now included working with accountants and legal counsel to ensure that both EasyBit and EasyBit Alabama were in compliance with all applicable laws. (*Id.*).

EasyBit Alabama was registered with the Alabama Secretary of State on July 29, 2015. On the same date, EasyBit Alabama registered for a business license with Jefferson County, Alabama. (*Id.* at ¶ 20). Under business location, the license listed: "EasyBit, 2412 2nd Ave. N, Apt. 4, Birmingham, Alabama 35203." (*Id.*). All of the fees associated with the registration and licensure of EasyBit Alabama were paid by EasyBit. (*Id.*). In accordance with the foregoing amendment of the Employment Agreement, EasyBit Alabama began to pay 70% of its net profits to EasyBit and 30% to Duncan. (*Id.* at ¶ 21).

In late 2015, EasyBit hired a COO, Jonathan Giger, to, among other things, track the financial performance of EasyBit and EasyBit Alabama. (*Id.* at ¶ 22). After reviewing the records and receipts for each of EasyBit's Bitcoin ATM's, and

6

comparing them to the records provided by Duncan, Giger determined that Duncan was underreporting to EasyBit the amount of cash generated by each of EasyBit's Bitcoin ATM's and keeping the difference for himself. (*Id.*). EasyBit has evidence that Duncan has thereby pocketed for himself at least $79,311 through underreporting to EasyBit the amount of cash generated by each of EasyBit's Bitcoin ATM's. (*Id.* at ¶ 23).

When Dupree confronted Duncan about this suspected embezzlement on February 4, 2016, Duncan immediately resigned as CEO of EasyBit, and directed any further inquiry to his lawyer. (*Id.* at ¶ 24). Over the next two or three days, after resigning from EasyBit, Duncan used his keys to all of EasyBit's Bitcoin ATM's in Georgia and Alabama to empty the cash from each of them. (*Id.* at ¶ 25). EasyBit has calculated that Duncan stole at least $16,712 in cash during this looting. (*Id.*). After his resignation, Duncan additionally refused to turn over to Easybit at least $60,923.98 he had reported emptying from EasyBit's Bitcoin ATM's prior to his resignation. (*Id.* at ¶ 26).

EasyBit reported Duncan's misconduct to the Lilburn, Georgia police department because it believed Duncan had not yet looted the EasyBit Bitcoin ATM located at a shop in Lilburn. (*Id.* at ¶ 27). The department's investigation is ongoing. (*Id.*).

Upon information and belief, Duncan also falsely told the owners and/or managers of the locations that host EasyBit's Bitcoin ATM's (i.e., Headmasters Barbershop) that Dupree and EasyBit were no longer operating in Georgia and Alabama, and that they should henceforth deal only with Duncan. (*Id.* at ¶ 28). Duncan physically removed two of EasyBit's Bitcoin ATM's and replaced, or attempted to replace, them with machines that he had apparently already leased from one of EasyBit's competitors. (*Id.* at ¶ 29). Although EasyBit has recovered the two Bitcoin ATM's, one of them was badly damaged by Duncan. (*Id.*).

Despite multiple requests to Duncan and his attorney, Duncan refuses to comply with the Non-Compete Covenant, or to return any of the funds he stole from EasyBit. (*Id.* at ¶ 30).

## ARGUMENT AND CITATION OF AUTHORITY

The facts contained in the Complaint establish that through a deliberate and illicit scheme, Duncan is violating the Non-Compete Covenant and tortiously interfering with EasyBit's contractual and business relations. The irreparable harm to EasyBit from this ongoing misconduct leaps from the page, and it should therefore be enjoined. As explained further below, EasyBit's instant Motion should be granted.

## A.   <u>**Applicable Legal Standard**</u>

To be eligible for a temporary restraining order or preliminary injunctive relief under Rule 65, a movant must establish each of the following elements: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest.

*Edgefield Holdings, LLC v. Mason*, No. 1:15-cv-2481-WSD, 2015 U.S. Dist. LEXIS 92501, at *4 (N.D. Ga. July 15, 2015); *accord*, *e.g.*, *Blake v. Bank of Am., N.A.*, No. 1:14-cv-3252-TWT-JSA, 2015 U.S. Dist. LEXIS 106601, at *17-18 (N.D. Ga. June 24, 2015); *Ford v. 1280 West Condo. Ass'n*, No. 1:14-cv-00527-RWS, 2014 U.S. Dist. LEXIS 121792, at *37-38 (N.D. Ga. Sept. 2, 2014).[1] "Of these four requisites, the first factor, establishing a substantial likelihood of success on the merits, is most important …." *Maria v. Khiani Alpharetta, LLC*, No. 1:13-cv-01415-RWS, 2015 U.S. Dist. LEXIS 45070, at *2-3 (N.D. Ga. Apr. 7, 2015) (quoting *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1294 (S.D. Fla. 2008)). In the present case,

---

[1] While Rule 65(b) addresses temporary restraining orders issued without notice to the other party, here EasyBit has provided notice to Duncan by serving him with its moving papers along with the Summons and Complaint, and will also provided him with notice of the TRO hearing.

EasyBit has met its burden of proof on all four factors. For these reasons, EasyBit's Motion should be granted.

### 1. EasyBit Has a Substantial Likelihood of Success on the Merits

#### a. Duncan's Violation of the Non-Compete Covenant

There is a substantial likelihood that EasyBit will prevail on its claim that Duncan has violated the Non-Compete Covenant. Georgia Courts historically have granted interlocutory injunctions against former employees who violated reasonable restrictive covenants. *See*, *e.g.*, *Lee v. Envtl. Pest & Termite Control*, 271 Ga. 371, 374, 516 S.E.2d 76, 78-79 (1999) (injunctive relief appropriate where employee violated non-disclosure provision of employment agreement and used confidential information to start a competing business); *Nunn v. Orkin Exterminating Co.*, 256 Ga. 558, 559, 350 S.E.2d 425, 426 (1986) (injunctive relief appropriate to prevent former employee from violating non-competition, non-solicitation, and non-disclosure provisions of employment agreement).

Enactment of the Georgia Restrictive Covenant Statute (the "Covenant Statute"), O.C.G.A. § 13-8-50, *et seq*., substantially tipped the scales in favor of employers seeking to hold employees to their restrictive covenants. In doing so, the Georgia legislature deliberately and unmistakably rejected hostility to restrictive employment covenants in favor of a more flexible and accommodating approach.

Indeed, the Covenant Statute now allows even overly broad restrictive covenants to be "blue-penciled" and enforced so long as they were entered into after May 11, 2011. *See* O.C.G.A. §§ 13-8-53(d), 13-8-54(b)*; Murphee v. Yancey Bros. Co*., 311 Ga. App. 744, 747 n.10, 716 S.E.2d 824, 826 (2011).

EasyBit is substantially likely to prevail because the Non-Compete Covenant is reasonable on its face, as Duncan implicitly acknowledged by agreeing to the Non-Compete Covenant "as is" after he negotiated it down from two years to one year after the end of his employment. (Compl., ¶¶ 12-13, Ex. "A"). Even without the benefit of the Covenant Statute, EasyBit likely would prevail because Duncan has breached, and intends to continue to breach, his contractual obligations by engaging in "the same or similar activities" as he performed as CEO of EasyBit in direct competition with it for Bitcoin ATM business in Alabama and Georgia. In light of the Covenant Statute, however, there is little doubt that EasyBit will prevail, as it can satisfy all requirements of the Covenant Statute, as discussed below.

### i.   *EasyBit Has Legitimate Business Interests to Protect*

Under the Covenant Statute, an employer seeking to enforce a restrictive covenant "shall plead and prove the existence of one or more legitimate business interests justifying the covenant." O.C.G.A. § 13-8-55. Legitimate business interests include, but are not limited to, valuable confidential information, substantial

relationships with existing customers, good will associated with an ongoing business, and specialized training. O.C.G.A. § 13-8-51(9). EasyBit has precisely these legitimate business interests justifying the Non-Compete Covenant. (*See* Compl., ¶ 17).

### ii.    The Non-Compete Covenant Is Reasonable

EasyBit can establish by *prima facie* evidence that the Non-Compete Covenant is reasonable in time, geographic area, and scope. O.C.G.A. §§ 13-8-53, 13-8-55. Under the Covenant Statute, post-termination non-compete covenants are presumed to be reasonable in time if not more than two (2) years in duration. O.C.G.A. § 13-8-57(b). A territorial restriction is presumed reasonable if it "includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant," provided that the total distance encompassed by the covenant also is reasonable or any list of prohibited employers is limited in time. O.C.G.A. § 13-8-56(2). Finally, any scope of a restrictive covenant that "is measured by the business of the employer" is presumptively reasonable. O.C.G.A. § 13-8-56(3). In sum, "any description that provides fair notice of the maximum reasonable scope of the restraint shall satisfy [the requirements of the Covenant Statute]." O.C.G.A. § 13-8-53(c)(1).

The Non-Compete Covenant satisfies these requirements. It runs for no longer than one (1) year following Duncan's termination of employment, and further limits the scope to the "same or similar activities as were performed for [EasyBit] in any business which distributes or sells products or provides services similar to those distributed sold or provided by [EasyBit] …." (Compl., Ex. "A"). The Non-Compete Covenant that Duncan negotiated and signed gave him fair notice of the maximum reasonable scope of the restraint, and is therefore enforceable under the Covenant Statute.

> ### iii.    Duncan May Be Subject to the Non-Compete Covenant

The Covenant Statute permits enforcement of non-compete covenants after the term of employment only against certain kinds of employees, including an employee who, in the course of his or her employment:

> (1) Customarily and regularly solicit[s] for the employer customers or prospective customers;
> (2) Customarily and regularly engage[s] in making sales or obtaining orders or contracts for products or services to be performed by others;
> … or
> (4) Performed the duties of a key employee….

O.C.G.A. § 13-8-53(a). "Key employee" includes an employee who, by reason of the employer's "exposure to customers," has gained a "high level of influence or credibility with the employer's customers," as well as "an employee in possession

of ... customer contacts or customer information who has obtained such ... contacts, or information by reason of having worked for the employer." O.C.G.A. § 13-8-51(8). EasyBit is entitled to enforce the Non-Compete Covenant against Duncan because he meets the criteria of O.C.G.A. § 13-8-53(1) and (2) and the definition of a key employee. (*See* Compl., ¶¶ 13-17).

In sum, EasyBit has a substantial likelihood of success because the Non-Compete Covenant satisfies the requirements of the Covenant Statute. Moreover, if the Court should find the Non-Compete Covenant of the Employment Agreement to be overly broad in any respect, then the Court is authorized to "blue pencil" it and enforce the Non-Compete Covenant as modified. O.C.G.A. §13-8-54(b). *See PointeNorth Ins. Group v. Zander*, No. 1:11-cv-3212-RWS, 2011 U.S. Dist. LEXIS 113413, at *8-9 (N.D. Ga. Sept. 29, 2011).[2]

---

[2] As noted above, EasyBit is not sure whether Duncan signed the Employment Agreement in Georgia or Alabama. Although this Memorandum of Law shows that the Non-Compete Covenant in valid and enforceable under Georgia law, it is equally so under Alabama law.

Pursuant to Ala. Code  § 8-1-1(b), an employee "may agree with his employer to refrain from carrying on or engaging in a similar business…within a specified county, city or part thereof so long as the employer carries on a like business therein." Restrictive employment covenants will therefore be upheld and enforced under Alabama law if "(1) the employer has a protectable interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; and (4) the restriction imposes no undue hardship on the employee." *Central Bancshares of the South, Inc. v. Puckett*, 584 So. 2d 829, 831 (Ala. 1999) (quoting *James S. Kemper & Co. v. Cox & Assoc.*, 434 So. 2d 1380, 1384 (Ala. 1983));

b.   Duncan's   Tortious   Interference   with   EasyBit's
Contractual and Business Relations

There is also a substantial likelihood that EasyBit will prevail on its claim that

Duncan has tortiously interfered with its contractual and business relations. The

_____

*accord, e.g., Clark v. Liberty Nat'l Life Ins. Co*., 592 So. 2d 564, 565-66 (Ala. 1992).
In considering these factors, moreover, courts have essentially mirrored the Georgia
authorities cited herein. Specifically, (i) an employer has a protectable interest if,
among other things, an employee is in a position to gain confidential information,
access a secret list, or develop close relationships with clients, *see, e.g*., *Sheffield v.
Stoudenmire*, 553 So. 2d 125, 126 (Ala. 1989), (ii) restrictions as to competition in
the employer's line of business are, as a matter of law, reasonably related to a
protectable interest, *see, e.g., Central Bancshares*, 584 So. 2d at 831, (iii) post-
employment restrictive covenants of two years or less are virtually bullet proof in
duration, *see, e.g., Clark*, 592 So. 2d at 566 ("[T]here can be no doubt that a two-
year period for the restriction is reasonable.") (quoting *James S. Kemper*, 434 So. 2d
at 1385)), and (iv) the restrictive covenant will not be deemed to work an undue
hardship on the employee if it does not deprive him of a reasonable opportunity to
still earn a living, especially if the employee was well compensated during her
employment, *see, e.g., Central Bank of the South v. Beasley*, 439 So. 2d 70, 74 (Ala.
1983). Further, courts have discretion under Alabama law to blue pencil overbroad
restrictive covenants and enforce them as modified. *See, e.g., Mason Corp. v.
Kennedy*, 244 So. 2d 585, 590 (Ala. 1971) ("[A] court of equity has the power to
enforce a contract against competition although the territory or period may be
unreasonable, by granting an injunction restraining the respondent from competing
for a reasonable time and within a reasonable area."); *see also Evans v. FACCO
USA, Inc*., No. 5:15-cv-02241-MHH, 2016 U.S. Dist. LEXIS 8978, at *39-40 (N.D.
Ala. Jan. 26, 2016) (blue pencils and enforces restrictive covenant). Finally,
Alabama's new restrictive covenant statute, Ala. Code §§ 8-1-190 to 8-1-197, which
was signed into law on June 11, 2015 and became effective on January 1, 2016, is
even more friendly to restrictive employment covenants than the case law construing
§ 8-1-1(b). As a result, if this new statute is deemed to apply retroactively to
agreements entered into prior to January 1, 2016, it would only serve to reinforce the
validity of the Non-Compete Covenant under Alabama law.

elements EasyBit will have to prove for its claim of tortious interference are:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Northeast Georgia Cancer Care, LLC v. Blue Cross & Blue Shield of Georgia, Inc.*, 297 Ga. App. 28, 676 S.E.2d 428, 433 (2009).

After he resigned as CEO of EasyBit, Duncan began directing the owners and/or managers of the locations that host EasyBit's Bitcoin ATM's to deal only with him, and to no longer work with EasyBit. These actions were clearly improper and without privilege. *See Taylor v. Calvary Baptist Temple*, 279 Ga. App. 71, 630 S.E.2d 604, 606 (2006) (To establish that a defendant acted "without privilege," plaintiff need merely show that the defendant was a "third part[y] to the alleged business relationship…").

By explicitly providing direction to EasyBit's host locations to deal only with him, Duncan also acted purposely and with malice with the intent to injure EasyBit. "The malice element of the cause of action 'is broadly construed to encompass any unauthorized interference or any interference without legal justification or excuse.'" *Walker v. Gowen Stores LLC*, 322 Ga. App. 376, 745 S.E.2d 287, 289 (2013)

(citation omitted). There is no justification or excuse for Duncan to intentionally mislead EasyBit's host locations, inducing them to breach their agreements with EasyBit, or put its Bitcoin ATM's on the street.

To the extent Duncan's past and future solicitations of EasyBit's host locations have any success, they will thereby cause those host locations not to use EasyBit's Bitcoin ATM's, proximately causing financial harm to EasyBit as well as causing irreparable harm to EasyBit's goodwill and contractual and business relations.

### 2. <u>EasyBit Will Suffer Irreparable Injury If Immediate Injunctive Relief Is Not Granted</u>

The benchmark to demonstrate an inadequate remedy at law is not overly demanding. "Equity will not take cognizance of a plain legal right where an adequate and *complete* remedy is provided by law; but the mere privilege of a party to bring an action at law or the existence of a common-law remedy *not as complete or effectual* as the equitable relief *shall not deprive equity of jurisdiction*." O.C.G.A. § 23-1-4 (emphasis added). As the Georgia Supreme Court has explained:

> A remedy at law, to exclude appropriate relief in equity, must be complete and the substantial equivalent of the equitable relief. It is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity.

*Atl. Coast Line R.R. v. Gunn*, 185 Ga. 108, 110, 194 S.E. 365, 367 (1937); *accord,*

*e.g.*, *Sherrer v. Hale*, 248 Ga. 793, 797-98, 285 S.E.2d 714, 718 (1982). Equity will take jurisdiction where "from any peculiar circumstances, the operation of the general rules of law would be deficient in protecting from anticipated wrong or relieving for injuries done." O.C.G.A. § 23-1-3.

Damages alone can never provide full compensation for the loss of existing and prospective customers, and injury to goodwill and reputation. *See, e.g.*, *Mohr v. Bank of N.Y. Mellon Corp.*, 393 F. App'x 639, 646 (11th Cir. 2010) (applying Georgia law) ("the loss of customers and goodwill is an irreparable injury"); *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (same); *Poe & Brown of Ga., Inc. v. Gill,* 268 Ga. 749, 750, 452 S.E.2d 864, 865 (1997) (trial court abused its discretion by failing to grant injunctive relief because loss of customers results in injury that cannot be quantified). Moreover, a party "is not required to await the infliction of the injury before seeking to prevent it by injunction." *Looper v. Ga. S. & F.R.R.,* 213 Ga. 279, 281-82, 99 S.E.2d 101, 103 (1957). "Equitable relief will not be denied where solid reasons are alleged and shown to justify the apprehension." *Newman v. Smith*, 217 Ga. 465, 470, 123 S.E.2d 305, 308 (1961).

Put simply, EasyBit has little to no chance of recovering in full for the damages it will suffer to its relationships with the owners and/or managers of the

locations that host EasyBit's Bitcoin ATM's, and to its general reputation and goodwill, if Duncan is allowed to violate his non-compete obligations and tortiously interfere with EasyBit's contractual and business relations by flagrantly performing identical services at these same locations either for himself or on behalf of one of EasyBit's competitors. Either way, he would be directly competing with EasyBit and interfering with EasyBit's existing contractual and business relationships. Given the difficulty of calculating damages, EasyBit can only be fully protected if Duncan is enjoined from carrying out his stated intention to stand in EasyBit's place and have EasyBit's customers and host locations deal only with him instead of EasyBit. (*See* Compl., ¶ 28).

### 3.   The Balance Of Harms And The Public Interest Favor Granting Injunctive Relief To EasyBit

A primary consideration in deciding whether to issue an interlocutory injunction is the balance of equities between the parties:

> The superior court's task on application for interlocutory injunction was to balance the conveniences of the parties, to preserve the status quo, and to consider whether greater harm would result from granting or refusing the injunction.

*Wilson v. Sermons*, 236 Ga. 400, 400, 223 S.E. 2d 816, 817 (1976); *accord, e.g.*, *Ga. Dep't of Agric. v. Ga. Crown Distrib. Co.*, 262 Ga. 761, 761, 425 S.E.2d 876 (1993); *Jackson v. Delk*, 257 Ga. 541, 543-44, 361 S.E.2d 370, 373 (1987) (purpose of an

interlocutory injunction is to preserve status quo and balance convenience of the parties); *see also Cellairis Franchise, Inc. v. Duarte*, No. 2:15-cv-00101-WCO, 2015 U.S. Dist. LEXIS 147890, at *22 (N.D. Ga. Oct. 21, 2015) ("[T]he status quo is plaintiffs' ability to operate their business without improper competition [from defendant's breach of his restrictive covenant].").

In this context, courts should not give much, if any, weight to any harm resulting from the inability to proceed with violating a restrictive covenant.  *See*, *e.g.*, *Amedisys Holding, L.L.C. v. Interim Healthcare of Atlanta, Inc.*, 793 F. Supp. 2d 1302, 1314-15 (N.D. Ga. 2011) (Duffey, J.) (it will not harm defendants merely to enjoin them from continuing to use misappropriated information); *Specialty Chems. & Servs., Inc. v. Chandler, Ci*vil Action No. 1:87-cv-2338-MHS, 1988 U.S. Dist. LEXIS 16090, at *11 (N.D. Ga. Sept. 26, 1988) (defendants "cannot suffer compensable harm when enjoined from unlawful activity").  As one federal court recognized:

> Although Defendants may suffer harm as a result of the [preliminary] injunction, this harm is the result of enforcement of a covenant not to compete to which Defendants agreed and which Defendants have not demonstrated violates public policy.  The Court further finds that enforcement of an ostensibly enforceable covenant not to compete would not be adverse to the public interest.

*Smallbizpros, Inc. v. Court*, 414 F. Supp. 2d 1245, 1251 (M.D. Ga. 2006) (Land, J.). Discounting any harm from enforcing a restrictive covenant is particularly true

now that the public interest in Georgia plainly favors enforcing such covenants. As the Georgia General Assembly noted, it enacted the Covenant Statute to "creat[e] an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." O.C.G.A. § 13-8-50 (legislative findings); *see Cellairis*, 2015 U.S. Dist. LEXIS 147890, at *24 (in light of the Covenant Statute, enforcing valid restrictive covenants, and thereby preventing unfair competition, "serves the public interest").

Duncan knowingly signed the Non-Compete Covenant. The Court should maintain the status quo and hold Duncan to the terms of that Non-Compete Covenant pending a final disposition of this case. In short, the public policy reflected in the Covenant Statute, and the threatened harm to EasyBit if the Court does not issue immediate injunctive relief here, overwhelmingly tip the scale in favor of granting the pending Motion.

## CONCLUSION

For all of the foregoing reasons, EasyBit respectfully requests that the Court grant Plaintiff's Motion for Temporary Restraining Order and enter an Order pursuant to Fed. R. Civ. P. 65 requiring that Duncan:

(A)   be enjoined from directly or indirectly violating or further violating the Non-Compete Covenant;

(B)   be enjoined from directly or indirectly interfering with EasyBit's contractual and business relationships; and

(C)   file with the Court and serve on counsel for EasyBit a written report setting forth in detail, under oath, the manner in which he has complied with the terms of this Court's Order.

For the convenience of the Court, a Proposed Order is attached hereto as Exhibit "A."

Respectfully submitted this 17th day of February, 2016.

**TAYLOR ENGLISH DUMA LLP**

*/s/Michael Eric Ross*
Michael Eric Ross
GA Bar No. 615190
Eric S. Fisher
GA Bar No. 250428
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
Telephone: (770) 434-6868
Facsimile: (770) 434-7376
mross@taylorenglish.com
efisher@taylorenglish.com

*Counsel for Plaintiff Wah Sing (US) Trading Limited, LLC d/b/a EasyBit*

22

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

I hereby certify that the foregoing complies with the font and point requirements of LR 5.1, to wit, this brief was prepared in Times New Roman font, 14-point type.

**TAYLOR ENGLISH DUMA LLP**

_/s/Michael Eric Ross_
Michael Eric Ross
GA Bar No. 615190